UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Brenda L. Rand**

    **v.**                           Case No. 11-cv-55-PB
                                          Opinion No. 2013 DNH 133

**Town of Exeter, et al.**


## MEMORANDUM AND ORDER


Brenda Rand has sued her former employer, the Town of Exeter, as well as a former coworker and four of her former supervisors.  She alleges that the coworker sexually assaulted her while they were both working at the Town's waste transfer station.  She also claims that the Town and her supervisors failed to properly respond to her sexual harassment complaint and retaliated against her when she complained of the harassment.  She has brought claims under Title VII, New Hampshire's Law Against Discrimination, and state common law.

The defendants have moved for summary judgment.


## I.  BACKGROUND

Brenda Rand was employed as a solid waste transfer operator in the Town's highway department.  Doc. Nos. 22-2, 30.  The position required Rand to work alone at the Town's transfer

station assisting residents with the disposal and recycling of household waste.  George McAllister worked as a laborer in the same department.  Jay Perkins, Jennifer Perry, Donna Cisewski, and Russell Dean were employed by the Town in supervisory positions superior to both Rand and McAllister.  Id.

## A.    Sexual Harassment

On November 12, 2009, McAllister opened the transfer station shortly before Rand arrived several minutes late as a result of a prior engagement.  Doc. Nos. 22-2, 30.  Rand thanked McAllister for his assistance by either patting him on the shoulder or giving him a hug and a kiss on the cheek.  Doc. No. 18-4.  Immediately thereafter, Rand alleges that McAllister grabbed her waist, pulled her body close to his, and fondled her breast.  Doc. Nos. 22-2, 30.  When Rand attempted to pull away, McAllister grabbed her hand and pressed it against his clothed, erect penis while laughing and repeating various lewd remarks.  McAllister then dragged Rand by her wrist approximately forty feet across the parking lot toward a location shielded from public view.  The incident ended abruptly when a Town resident pulled into the transfer station.  Rand and McAllister were the only eyewitnesses to these events.  Id.

Rand maintained a log book at the transfer station and noted the incident in an entry dated November 12, 2009.  Doc.

No. 22-4.  She told her husband about it the following day, and
he recommended that she report it to her immediate supervisor,
Perkins.  Doc. No. 18-4.  On November 17, 2009, Rand first
confided in one of her coworkers, Walter Dow, regarding the
incident before reporting it to Perkins, Perry, and Cisewski
later that day.  Doc. Nos. 22-2, 22-4, 22-13, 30.  When Rand
lodged her complaint, she provided the Town with her log book
containing the relevant entry.  Id.  Cisewski immediately
informed Rand and Perkins that McAllister would be prohibited
from visiting the transfer station during the pendency of the
investigation.  Doc. No. 18-4.  Cisewski and Perkins then agreed
that McAllister would be placed on administrative leave if he
admitted to the allegations.  Id.

As the Town's Human Resources Director, Cisewski was tasked
with investigating Rand's complaint in accordance with the
Town's Anti-Harassment Policy ("the Policy"), Doc. No. 23-2,
which contains the following relevant provisions.  Among other
examples of sexual harassment, "sexual . . . propositions" and
"unwanted physical contact" are prohibited.  Employees who feel
that they have been harassed must report each incident to the
Town's Human Resources Director (Cisewski) or the Town Manager
(Dean).  When a complaint is filed, the Town must promptly
initiate an investigation.  Complaints must be kept confidential

3

except to the extent that disclosure is required to complete the investigation.  An investigation typically includes interviews with the complainant, the alleged harasser, and any relevant witnesses.  An alleged harasser may be suspended pending investigation.  If the complainant is dissatisfied with the investigation, she must inform the Town Manager.  Id.

The Policy also forbids employees from retaliating against an employee who files a "good faith" complaint of sexual harassment or assists in a subsequent investigation.  Employees who engage in retaliatory behavior are subject to disciplinary action.  As with sexual harassment complaints, allegations of retaliation must be brought to the Town's Human Resources Director or the Town Manager.  Id.

In accordance with the Policy, Cisewski conducted two private interviews each with Rand, McAllister, and Dow.  Doc. No. 18-3.  In each case, Cisewski took handwritten notes during the interview and had the interviewee read and sign every page to acknowledge that the notes accurately reflected the substance of the interview.  Each interview was guided by a series of pre-printed questions tailored either to the complainant, the alleged harasser, or the witness.  The interviews also provided an opportunity for the interviewee to recount the relevant events in narrative form.  Id.

4

Cisewski conducted interviews with Rand on November 17 and 20, 2009.  Doc. No. 22-2.  Rand testified to the events as described above, except she asserted that she had patted McAllister on the shoulder rather than hugging him and giving him a kiss on the cheek.  Doc. Nos. 18-4, 22-5, 22-9.  Rand informed Cisewski that she was nervous, scared, and would not know what to do if McAllister were to come to the transfer station again.  Id.

Cisewski and Rand dispute whether, during the first interview, Rand showed Cisewski certain gouges, abrasions, and bruises on her right hand which allegedly resulted from the assault.  Doc. Nos. 18-4, 22-2, 22-4.  Rand submitted a written narrative of the incident at the first interview, and Cisewski and a second Town employee took photographs of Rand's hand during the second interview.  Rand also took photographs of her hand and gave them to Cisewski, who informed Rand that they were of inadequate quality and would be thrown away.  No photographs have been produced in discovery.  Id.  During the second interview, Cisewski presented Rand with a copy of the Town's Policy for her to read and sign.  Doc. No. 22-5.  Rand had not previously been made aware of the Policy despite having been employed by the Town for three and a half years.  Id.

When Cisewski interviewed McAllister on November 18, 2009,

5

McAllister testified that, as a result of his poor eyesight, he had stumbled while following too closely behind Rand in the transfer station's parking lot and reached out to break his fall.  Doc. Nos. 18-4, 22-4.  This caused his hand to accidentally brush against Rand's breast.  In a subsequent interview on November 20, McAllister testified that his hand had brushed against Rand's breast when he stumbled after she hugged him.  McAllister testified that there was no discussion between himself and Rand regarding this contact.  After assisting Rand for a few minutes, McAllister left the transfer station.  Id. McAllister's personnel record contains no information prior to the alleged assault regarding behavior that would place the Town on notice that he might violate the Town's Policy.  Doc. No. 23-2.  His personnel record contains a copy of the Policy, signed and acknowledged by McAllister shortly after the Town hired him in 2001.  Id.

Cisewski interviewed Dow on November 18 and 20, 2009.  Doc. Nos. 18-4, 22-4.  Dow confirmed that Rand had described essentially the same events as those Rand had related to Cisewski in her two interviews.  Dow testified, however, that Rand had informed him that she had thanked McAllister for opening the transfer station by hugging him and kissing him on the cheek rather than patting him on the shoulder, as Rand had

stated in her interviews.  Dow told Cisewski that he could not believe McAllister would behave as Rand alleged, and that he had not believed Rand's description of the events.  Id.

While the investigation proceeded, Rand requested a meeting with Cisewski, Perkins, and McAllister to discuss her allegations in person with the alleged harasser.  Doc. No. 22-4. That meeting never occurred, and on November 25, 2009, Cisewski submitted a written report of the results of the investigation to Dean.  On December 8, 2009, Rand attended a meeting with Cisewski, Perkins, and Perry to discuss the findings.  Doc. Nos. 18-12, 22-2, 30.  Cisewski informed Rand that the Town was unable to find merit in Rand's complaint, and therefore McAllister would not be disciplined and Rand should return to work.  Id.  Cisewski informed Rand that this finding was due to a lack of credible evidence corroborating Rand's version of events, as well as inconsistencies in Rand's interview testimony.  Doc. No. 22-4.

Upon receiving this news, Rand became extremely upset and abruptly left the meeting to seek out McAllister.  Doc. Nos. 18-10, 30.  Perkins summoned the police to remove her from the premises.  Id.  Cisewski, Perkins, and Perry then collected written statements from Town employees who had witnessed Rand's behavior following the meeting.  Doc. No. 22-4.  The next day,

Perry placed Rand on administrative leave with pay and informed her that she might be required to attend anger management counseling before returning to work.  Doc. Nos. 18-12, 22-2, 30.

**B.    Retaliation**

On November 24, 2009, one week after Rand informed the Town of the alleged sexual harassment, Dean received an emailed complaint from a Town resident who alleged that Rand had been rude to her at the transfer station two days earlier.  Doc. Nos. 20-12, 20-13, 22-2, 22-4, 30.  Perry and Perkins reprimanded Rand for her behavior as described in the email, as well as for violating Town rules prohibiting smoking in Town buildings.  In response, Rand provided a notebook to Perkins that contained her own account of the incident, maintaining that she behaved appropriately in the face of a resident's abusive conduct.  The same day, Perkins wrote in a memorandum to Rand's personnel file that Rand "is not a good fit at our transfer station and should be replaced."  Id.

Rand alleges that in early December, two male coworkers told her that Perkins had instructed some Town employees to "watch out for" Rand.  Doc. Nos. 20-9, 20-10, 22-2, 22-4, 30.  During the same period, she also learned that a different coworker had been informed of Rand's sexual harassment complaint in violation of the Policy's confidentiality provisions.  After

8

she filed her complaint, Rand noticed that several coworkers became less friendly toward her.  Id.

Rand claims that Perkins, whom she alleges was biased toward McAllister due to a preexisting outside business relationship, began closely scrutinizing Rand's job performance after she filed her complaint.  Doc. Nos. 22-2, 22-4.  She further claims that Perkins instructed Rand to perform her job responsibilities in a manner that she believed would violate state environmental protection laws.  Rand asserts that Perkins considered her a "troublemaker," having twice passed her over for promotion after he had previously promised her a full-time position when one became available.  Id.

On December 3, 2009, Perry and Rand spoke by telephone about the need for Rand to improve her ability to defuse altercations with difficult town residents.  Doc. No. 22-4. Perry implied that Perkins had instructed Rand regarding this issue on numerous prior occasions, which Rand disputes.  Id. That same day, Perkins documented two additional complaints lodged by residents in the preceding weeks.  Doc. Nos. 18-10, 22-4.  The first alleged that Rand was rude to a resident who arrived at the transfer station just prior to its closing time. The second alleged that Rand had failed to assist an elderly resident who had needed help to dispose of waste that she had

brought to the transfer station. Id.

On December 12, 2009, Rand's attorney filed a written request for Rand's personnel file. Doc. Nos. 22-5, 22-10, 22-12. The Town did not begin to deliver sections of Rand's file until two months later. Also on December 12, Rand's attorney provided formal written notice to Dean that Rand was dissatisfied with the investigation, in accordance with the Town's Policy. The Town never responded. Id. That same day, Rand filed the first of two complaints with the New Hampshire Commission for Human Rights and the Equal Employment Opportunity Commission (EEOC). Doc. No. 22-2.

The Town repeatedly extended Rand's paid administrative leave over the following five months. Doc. Nos. 18-12, 22-3, 22-4, 22-5. On January 15, 2010, Perry and Rand spoke by telephone regarding a certificate issued by the state Department of Environmental Services noting Rand's attendance at a workshop required to maintain a necessary license. Perry informed Rand that her license would not be renewed because Rand had admitted to altering the date on the attendance certificate. Rand denies that she altered the date or that she told Perry that she had done so. Id.

On May 19, 2010, while Rand was still on administrative leave, Perry called Rand and asked her to attend a meeting the

10

following day regarding her future employment with the Town.
Doc. Nos. 18-12, 22-3, 22-4, 30.  Rand informed Perry that her
attorney would be unable to accompany her to the meeting on such
short notice, that she would not attend the meeting without her
attorney, and that she would prefer that the meeting be
rescheduled.  Perry informed Rand that her attorney was not
invited.  When Rand did not attend the meeting the following
day, Dean consulted with Perkins, Perry, and Cisewski prior to
terminating Rand's employment on the basis of several alleged
violations of the Town's Personnel Plan.[1]  Id.

    Rand asserts that each of the stated reasons for her
termination is groundless.  Doc. Nos. 22-3, 30.  Prior to her
sexual harassment complaint on November 17, 2009, Rand had
received positive performance reviews, and she asserts that she
had never received a reprimand before lodging the complaint.
Doc. Nos. 22-2, 22-6, 22-13, 30.  Rand claims that a memorandum
in her personnel file dated April 22, 2009, memorializing an
incident in which Rand was the subject of multiple complaints by

---

[1] The stated reasons include "[u]nnecessary violence or indignity
to a citizen," "[d]isobedience or violation of any department
regulation, rule, order, instruction or memorandum,"
"[i]ndecent, profane or unnecessary [sic] harsh language,"
"[c]onduct tending to cause ill repute on [sic] the Town,"
"[f]alsifying any Town record or report," and "[t]hreatening,
intimidating, coercing or interfering with any fellow employees
on Town premises or during working hours."  Doc. No. 20-8.

Town residents regarding her poor job performance, was in
reality drafted after Rand filed the sexual harassment
complaint.  Doc. Nos. 18-10, 22-4.  Rand claims that Perkins
fabricated this memorandum in an effort to develop additional
documentary support to fire her.   Id.

Rand alleges that she suffered various economic, emotional,
and reputational injuries as a result of the sexual assault and
the Town's subsequent actions from November 12, 2009 until May
20, 2010.  Doc. No. 30.


## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  The court must consider the evidence submitted in
support of the motion in the light most favorable to the
nonmoving party, drawing all reasonable inferences in its favor.
<u>See</u> Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the
absence of any genuine dispute of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  A material fact is one
"that might affect the outcome of the suit under the governing
law." Fed. Deposit Ins. Corp. v. Estrada-Rivera, 722 F.3d 50,

12

54 (1st Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the moving party satisfies this burden, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.  "Conclusory allegations and rank speculation, even if couched in pejorative language, will not suffice to defeat a properly supported summary judgment motion." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).

### III.  ANALYSIS

Rand's seven-count complaint asserts Title VII claims for hostile work environment sexual harassment, 42 U.S.C. § 2000e-2, and retaliation, § 2000e-3(a) (Count I); state law claims of hostile work environment sexual harassment, N.H. Rev. Stat. Ann. § 354-A:7, and retaliation, § 354-A:19 (Count II); assault and battery (Count III); intentional and negligent infliction of emotional distress (Count IV); wrongful termination of employment (Count V); defamation (Count VI); and intentional interference with contract and advantageous business relations

(Count VII).  I begin by examining defendants' challenge to Rand's harassment and retaliation claims.

**A.** **Counts I and II: Sexual Harassment Claims**[2]

    1.  Harassment Claims Against the Town

Under both Title VII and state law, the appropriate standard governing employer liability for hostile work environment sexual harassment depends on whether a supervisor or coworker initiated the harassment.  See Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013); see also Madeja v. MPB Corp., 149 N.H. 371, 378, 821 A.2d 1034, 1042 (2003) (interpreting section 354-A:7 of the New Hampshire Revised Statutes in accordance with relevant Title VII employer liability standards for coworker sexual harassment).  It is

---

[2] Count II also asserts that defendants are liable under N.H. Rev. Stat. Ann. §§ 275:36 et seq., prohibiting wage discrimination and discrimination on the basis of tobacco use in employment.  Rand alleges that she was not paid for two hours when she was interviewed during the investigation of her sexual harassment complaint and that other Town employees received higher pay for nighttime work than she did.  Doc. Nos. 22-2, 22-4.  Rand does not allege that the Town paid male employees for the time they were required to be interviewed, and she provides no evidence that male employees were paid at a different rate for nighttime work than she was.  Rand was also reprimanded for smoking in Town buildings, but she provides no evidence that other employees were permitted to smoke in these buildings.  Because the statute requires a comparison between similarly-situated employees of both sexes, see Bartholomew v. Delahaye Grp., Inc., No. 95-20-B, 1995 WL 907897, at *7 (D.N.H. Nov. 8, 1995), the Town's motion for summary judgment with respect to this claim is granted.

undisputed that McAllister was Rand's coworker; thus, she "must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 36 (1st Cir. 2012) (quoting Wilson v. Moulison N. Corp., 639 F.3d 1, 7 (1st Cir. 2011)); accord 29 C.F.R. § 1604.11(d).

The Town did not know, and could not have known, of the alleged conduct until Rand reported her allegations on November 17, 2009.  McAllister had not previously engaged in similar conduct or otherwise behaved in a manner to indicate he was likely to violate the Town's Anti-Harassment Policy.  He had read and signed a copy of the Policy when the Town first hired him, and his performance reviews were generally positive thereafter.

Once the Town was on notice of the allegations, it took prompt remedial action.  See Wilson, 639 F.3d at 7-8. Immediately after the Town received Rand's complaint, it prohibited McAllister from going to Rand's worksite.  Within three days, Cisewski had twice interviewed the three employees with knowledge of the events.  Notes from each interview were recorded and acknowledged, and Cisewski utilized an interviewing guide tailored to each interviewee.  Five days after the final

15

interview, Cisewski delivered a written report of her findings to Dean, and two weeks later, Rand was informed of the investigation's outcome.

This process comported with the Town's Policy, which provides at least minimally adequate remedial procedures following a complaint of sexual harassment.  As the Ninth Circuit has noted,

> [W]here the proof of harassment is weak and disputed . . . the employer need not take formal disciplinary action simply to prove that it is serious about stopping sexual harassment in the workplace.  Where, as here, the employer takes prompt steps to stop the harassment, liability cannot be premised on perceived inadequacies in the investigation.

Swenson v. Potter, 271 F.3d 1184, 1197-98 (9th Cir. 2001) (footnote omitted).  By immediately separating Rand and McAllister and commencing a prompt investigation, the Town took effective steps to prevent and deter subsequent harassment, and there is no allegation that any further sexual harassment occurred.[3]  See Espinal, 693 F.3d at 37; Wilson, 639 F.3d at 8.

---

[3] The alleged harassment took place prior to Rand's initial complaint, and no harassment is alleged to have occurred after the complaint.  Thus, it is also far from clear that "the harassment [was] causally connected to some negligence on the employer's part."  See Wilson, 639 F.3d at 7 (quoting Noviello v. City of Bos., 398 F.3d 76, 95 (1st Cir. 2005)).  Because the Town's response was prompt, appropriate, and not negligent as a matter of law, I need not address the causation issue.

Rand is understandably frustrated that the Town did not accept her version of what happened at the transfer station, but state and federal antidiscrimination laws do not require an employer to adopt the complainant's account of a disputed sexual harassment claim.[4]  What matters is whether the employer was negligent in allowing the harassment to occur and whether it took reasonable steps to respond to the claim that harassment had occurred.  Here, the undisputed evidence demonstrates that the Town had an adequate antidiscrimination policy in place, it had no reason to anticipate McAllister's assault, and it took prompt and effective action to respond to Rand's complaint.  As a result, the Town cannot be held liable for sexual harassment under either federal or state law simply because it failed to accept Rand's account of the harassment.  I therefore grant the Town's motion for summary judgment on the federal and state law sexual harassment claims.

    2.   <u>Harassment Claims Against Rand's Supervisors</u>

---

[4] Rand alleges that the Town's investigation was "a sham," "tainted," "negligent," "half-hearted," "totally-ineffectual," and "calculated not so much to ascertain the truth as to create a self-serving, counterfeit record . . . [to] insulate the Town from civil liability."  Doc. Nos. 22-2, 22-4.  But such speculation is not sufficient to overcome a motion for summary judgment when the record otherwise illustrates prompt and appropriate remedial action.

Consistent with the view in the majority of circuits, the First Circuit has determined that Title VII does not provide a cause of action against individual employees. Fantini v. Salem State Coll., 557 F.3d 22, 28-31 (1st Cir. 2009). Thus, Rand's supervisors cannot be held individually liable for any alleged harassment under federal law.

The New Hampshire Supreme Court has not yet determined whether individual employees may be held liable for sexual harassment or retaliation under sections 354-A:7 and 354-A:19 of the New Hampshire Revised Statutes. Decisions of this court, however, have consistently found that these statutes do not permit individual employee liability.[5] Wilson v. Port City Air, Inc., No. 13-cv-129-JD, 2013 WL 2631860, at *1-2 (D.N.H. June 12, 2013); Jones v. McFarland Ford Sales, Inc., No. 05-cv-347-JD, Op. No. 2005 DNH 163, 3-7. On the basis of the reasoning in those decisions, the individual defendants are entitled to summary judgment on Rand's federal and state law sexual harassment claims.

**B.   Counts I and II: Retaliation Claims**

---

[5] A New Hampshire Superior Court Judge has reached a contrary conclusion. D'Keefe v. Keene Senior Ctr., Inc., No. 09-C-0016, 2009 WL 8638450, at *1 (N.H. Sup. Ct. Oct. 13, 2009); Rowe v. Thibeault Corp., No. 06-E-554, 2007 WL 3236169, at *1 (N.H. Sup. Ct. July 31, 2007). Nevertheless, I find Judge DiClerico's reasoning in Port City Air and Jones to be persuasive, and I adopt it here.

1.   Retaliation Claims Against the Town

Employer liability for retaliation under Title VII and state law is governed by McDonnell Douglas Corp. v. Green's burden shifting framework.  See 411 U.S. 792, 802-04 (1973); see also Madeja, 149 N.H. at 378-79, 821 A.2d at 1043-44 (interpreting section 354-A:19 of the New Hampshire Revised Statutes in accordance with Title VII employer liability standards for retaliation).  As the First Circuit recently explained:

> [A] plaintiff must first establish . . . that (1) she engaged in protected conduct, (2) she was subject to an adverse employment action, and (3) a causal connection existed between the first and second elements.  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its challenged actions. . . . [I]f the defendant does so, the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.

Colon v. Tracey, 717 F.3d 43, 49 (1st Cir. 2013) (footnote, citations, and internal quotation marks omitted).

The Town challenges the retaliation claim by arguing that the evidence will not support a finding that the adverse employment actions Rand complains of occurred because she had engaged in protected conduct.  I disagree.

Rand began receiving reprimands for her job performance one week after filing her complaint with the Town.  She learned that

19

employees had been instructed to avoid her a week later, and she was placed on administrative leave the following week.  The Town refused to turn over her personnel record immediately after she filed her complaint with the EEOC, refused to renew her license one month later, kept her on administrative leave for months, and terminated her employment five months later.  A reasonable jury could find that there was sufficient temporal proximity between these events to support an inference of causation.  See Jones v. Walgreen Co., 679 F.3d 9, 21 (1st Cir. 2012) (permitting an inference of causation when three and a half months elapsed between protected activity and an adverse employment action).

Although the Town has articulated legitimate, non-discriminatory reasons for the adverse employment actions of which Rand complains, Rand has responded with sufficient evidence to support a triable claim that its proferred reasons for its actions were a mere pretext for unlawful retaliation.

Proof of pretext is not governed by a "mechanical formula" and may be presented in several different ways.  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003).  One appropriate method is "showing that the employer's proffered explanation is unworthy of credence."  Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

Rand points to evidence of pretext beyond mere temporal proximity to show that the Town's explanation is not credible. Rand's only performance review prior to the complaint was positive, and she asserts that she was never reprimanded prior to the time that she filed her complaint.  The one reprimand in her file dated before the complaint is not time-stamped or signed by Rand, and she alleges that it was placed in the file after she lodged her complaint.  In addition, the Town had not taken any action in response to a resident's oral complaint regarding an incident prior to Rand's sexual harassment allegations, but subsequently documented that complaint and reprimanded Rand after she made her allegations.  Rand has also presented evidence from the state Department of Environmental Services that she attended the workshop documented by her attendance certificate as proof that she would have no motive to falsify the certificate's date.  Finally, it is unclear why the Town would not permit Rand's attorney to attend a meeting regarding her employment given that an EEOC investigation was in process, and it is also not clear that it was reasonable for the Town to refuse to temporarily postpone a meeting scheduled on less than a day's notice given Rand's previous five months on indefinite administrative leave.

Rand has produced sufficient evidence in support of her claim to survive summary judgment.  Because "[d]eterminations of motive and intent, particularly in discrimination cases, are questions better suited for the jury," McDonough v. City of Quincy, 452 F.3d 8, 19 (1st Cir. 2006)  (quoting Mulero-Rodriguez v. Ponte, 98 F.3d 670, 677 (1st Cir. 1996)), I deny the Town's motion for summary judgment with respect to Rand's federal and state law retaliation claims against the Town.

2.   Retaliation Claims Against Rand's Supervisors

Neither federal nor state law provides for individual employee liability in retaliation cases.  See Fantini, 557 F.3d at 28-31; Port City Air, 2013 WL 2631860, at *1-2; Jones, 2005 DNH 163 at 3-7.  I therefore grant the supervisors' motion for summary judgment with respect to these claims.

C.   **Count III: Assault and Battery**

The New Hampshire Supreme Court has not defined the elements of the common law intentional torts of assault or battery.  Decisions of this court have relied on the Restatement to explicate the required elements.

A successful assault claim requires that "(1) the defendant . . . intended to cause harmful or offensive contact to the plaintiff, and (2) the plaintiff must have been put in imminent apprehension of such contact." King v. Friends of Kelly Ayotte,

22

860 F. Supp. 2d 118, 129-30 (D.N.H. 2012) (quoting Yale v. Town
of Allenstown, 969 F. Supp. 798, 801 (D.N.H. 1997) (citing
Restatement (Second) of Torts § 21(1) (1965))).  A defendant may
be held liable for battery if "(a) he acts intending to cause a
harmful or offensive contact with the person of the other or a
third person, or imminent apprehension of such a contact, and
(b) a harmful contact with the person of the other directly or
indirectly results."  Hudson v. Dr. Michael J. O'Connell's Pain
Care Ctr., Inc., 822 F. Supp. 2d 84, 94 (D.N.H. 2011) (quoting
United Nat'l Ins. Co. v. Penuche's, Inc., 128 F.3d 28, 32 (1st
Cir. 1997) (citing Restatement (Second) of Torts § 13 (1977))).
A reasonable jury crediting Rand's version of events could
surely find McAllister liable for assault and battery.

It is an entirely different question whether the Town may
be held vicariously liable for these intentional torts.  As the
New Hampshire Supreme Court has explained,

> [A]n employer may be held vicariously responsible for
> the tortious acts of its employee if the employee was
> acting within the scope of his or her employment when
> his or her tortious act injured the plaintiff. . . .
> [C]onduct falls within the scope of [an employee's]
> employment if: (1) it is of the kind she is employed
> to perform; (2) it occurs substantially within the
> authorized time and space limits; and (3) it is
> actuated, at least in part, by a purpose to serve the
> employer.

Porter v. City of Manchester, 155 N.H. 149, 152, 921 A.2d 393, 397-98 (2007).  There is no dispute that the alleged events occurred during the authorized time and space limits of McAllister's employment.  But no reasonable jury could conclude that McAllister, a laborer, was employed by the Town to assault and batter others, or that McAllister was motivated, even in part, to serve the Town when he allegedly engaged in this activity.

Accordingly, I deny summary judgment to McAllister and grant summary judgment to the Town with respect to Rand's assault and battery claim.

## D.   Count IV: Intentional Infliction of Emotional Distress

A defendant is liable for intentional infliction of emotional distress if he or she, "by extreme and outrageous conduct, intentionally or recklessly cause[d] severe emotional distress to another."  Tessier v. Rockefeller, 162 N.H. 324, 341, 33 A.3d 1118, 1131 (2011) (alteration in original) (quoting Morancy v. Morancy, 134 N.H. 493, 496, 593 A.2d 1158 (1991)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id. (quoting Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 729, 972 A.2d 1050 (2009)).  A reasonable

jury could find that McAllister's alleged verbal and physical conduct was sufficiently extreme and outrageous.  Cf. Miller v. CBC Cos., Inc., 908 F. Supp. 1054, 1068 (D.N.H. 1995) (denying motion to dismiss intentional infliction of emotional distress claim when defendant supervisor engaged in "disturbing verbal commentaries and personal attacks").  Further, Rand has alleged that she suffered severe emotional distress necessitating extensive psychological treatment.

On the other hand, none of the alleged conduct committed by the Town or by her supervisors comes close to the required "atrocious or utterly intolerable" standard.  See, e.g., Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260, 723 A.2d 30, 33 (1998) (holding illegal discharge insufficient to meet the standard).  In addition, for the reasons discussed in Section C, the Town and its supervisors cannot be held vicariously liable for emotional distress caused by McAllister while acting outside the scope of his employment.[6]

---

[6] To the extent that Rand asserts a negligent infliction of emotional distress claim, she must prove "(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms." Tessier, 162 N.H. at 342 (quoting O'Donnell v. HCA Health Servs. of N.H., Inc., 152 N.H. 608, 611, 883 A.2d 319 (2005)).  It is not necessary to consider the first two elements, because Rand has provided no evidence of objective physical symptoms accompanying her mental and emotional distress.  I therefore grant summary judgment to McAllister and the Town with respect

Accordingly, I deny summary judgment to McAllister and grant summary judgment to the Town with respect to Rand's intentional infliction of emotional distress claims.

**E.    Count V: Wrongful Termination**

The New Hampshire Supreme Court has articulated a two-part test for wrongful termination claims:

> First, the plaintiff must show that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment. . . . Second, the plaintiff must demonstrate that he was discharged because he performed an act that public policy would encourage, or refused to do something that public policy would condemn.

Porter v. City of Manchester, 151 N.H. 30, 38, 849 A.2d 103, 114 (2004) (citation and internal quotation marks omitted) (quoting Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)).  As discussed in Section B, Rand has presented sufficient evidence to permit a reasonable jury to find that the Town's legitimate, nondiscriminatory reasons for her termination were in fact a pretext for retaliatory animus. New Hampshire has established a public policy encouraging employees to report allegations of sexual harassment to their employers and to relevant administrative agencies and to actively participate in subsequent investigations.  See N.H. Rev. Stat. Ann. §§ 354-A:1, :19.  Because Rand's wrongful

to this claim.

26

termination claim must be considered by a jury in conjunction
with her retaliation claims, I deny the Town's motion for
summary judgment on this count.

**F.   Count VI: Defamation**

Rand premises her defamation claim on the letter that the
Town sent to her terminating her employment.[7]   The letter
contained allegations, disputed by Rand, that she had violated
various Town rules.   It is not necessary to consider whether
these allegations were false or defamatory, because there is no
evidence in the record that the letter or the allegations
therein were published to anyone other than Rand.   Cf. Thomas v.
Tel. Publ'g Co., 155 N.H. 314, 321, 929 A.2d 993, 1002 (2007)
(defamation requires "publi[cation of] a false and defamatory
statement of fact about the plaintiff to a third party").
Without publication, there can be no liability for defamation.
See Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons,
Inc., 138 N.H. 110, 118, 635 A.2d 487, 492 (1993).

---

[7] To the extent that Rand intends to incorporate her allegations
that the Town and her supervisors told other employees about her
complaint and instructed them to avoid her, there is no evidence
in the record that these statements were false.   First, an
instruction to avoid a person cannot be characterized as either
true or false.   Second, Rand did in fact file a complaint, and
although her employer may have violated its own confidentiality
policy by allegedly discussing that fact with Rand's coworkers,
that does not mean that Rand was defamed.   See Thomas v. Tel.
Publ'g Co., 155 N.H. 314, 335, 929 A.2d 993, 1012-13 (2007).

Accordingly, I grant summary judgment to all defendants with respect to Rand's defamation claim.

## G.   Count VII: Intentional Interference with Contract and Advantageous Business Relations[8]

Although not denominated as such, Rand appears to assert a claim of intentional interference with prospective contractual relations.[9]  See Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 306 (D.N.H. 2012) (distinguishing between existing and prospective contractual relations claims).  To establish liability for this tort, Rand must prove that "(1) [she] had an economic relationship with a third party; (2) the defendant[s] knew of this relationship; (3) the defendant[s] intentionally and improperly interfered with this relationship; and (4) [Rand] was damaged by such interference."  M & D Cycles, Inc. v. Am.

---

[8] Count VII asserts that the defendants "intentionally and/or negligently interfered" with Rand's contractual and business relations.  New Hampshire does not recognize the tort of negligent interference with contract.  Ferrero v. Coutts, 134 N.H. 292, 295, 591 A.2d 1320, 1322 (1991) (citing Blue Cross/Blue Shield of N.H.-Vt. v. St. Cyr, 123 N.H. 137, 143, 459 A.2d 226, 230 (1983)).  The parties do not cite, and I am not aware of, any authority recognizing a New Hampshire tort of negligent interference with advantageous business relations.  Therefore, I grant defendants' motion for summary judgment with respect to these claims.

[9] Because Rand was an at-will employee without an employment contract, she cannot state a claim for interference with existing contractual relations.  See Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 229 F. Supp. 2d 70, 73 (D.N.H. 2002) (citing Roberts v. Gen. Motors Corp., 138 N.H. 532, 539, 643 A.2d 956 (1994)), aff'd, 374 F.3d 23 (1st Cir. 2004).

Honda Motor Co., Inc., 208 F. Supp. 2d 115, 119 (D.N.H. 2002)

(citing Montrone v. Maxfield, 122 N.H. 724, 726, 449 A.2d 1216

(1982); Baker v. Dennis Brown Realty, 121 N.H. 640, 644, 433

A.2d 1271 (1981)), aff'd, 70 F. App'x 592 (1st Cir. 2003).

    Rand's claim fails at the first prong.  When Rand's

supervisors allegedly interfered with her "reasonable

expectation of economic advantage" by terminating her

employment, they did so as agents of the Town acting within the

scope of their employment.  Cf. Preyer v. Dartmouth Coll., 968

F. Supp. 20, 26 (D.N.H. 1997) (quoting Heritage Home Health,

Inc. v. Capital Region Health Care Corp., No. 95-558-JD, 1996 WL

655793, at *4 (D.N.H. Oct. 1, 1996)).  Because Rand's

supervisors were standing in the shoes of the Town when they

fired her, there was no third party relationship to interfere

with.[10]

---

[10] The supervisors could be held liable if they acted outside the
scope of their employment and were motivated by actual malice,
which is defined as "bad faith, personal ill will, spite,
hostility, or a deliberate intent to harm the plaintiff."  See
Preyer, 968 F. Supp. at 26 (quoting Soltani v. Smith, 812 F.
Supp. 1280, 1297 (D.N.H. 1993)).  Rand has failed to allege
sufficient facts to show that her supervisors were not acting,
at least in part, in furtherance of the Town's business when
they fired her.  Cf. Peck v. NGM Ins. Co., No. 94-90-B, 1995 WL
515628, at *9-10 (D.N.H. June 21, 1995); Soltani, 812 F. Supp.
at 1297.  In contrast, if she had succeeded in making such a
showing, the Town could not be held vicariously liable for
purposes of the wrongful termination claim.  Rand cannot have it
both ways.

Accordingly, I grant summary judgment to the supervisors with respect to the intentional interference with prospective contractual relations claim.

### IV.  <u>CONCLUSION</u>

Defendants' motion for summary judgment (Doc. No. 18) is granted with respect to all claims except Rand's retaliation claims against the Town (Counts I and II), her assault and intentional infliction of emotional distress claims against McAllister (Counts III and IV), and her wrongful termination claim (Count V).

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

October 2, 2013

cc:  Duncan J. MacCallum, Esq.
      William G. Scott, Esq.
      Daniel J. Mullen, Esq.